Kixsports, LLC v. Munn, 2021 NCBC 23.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

KIXSPORTS, LLC,

       Plaintiff,

v.

RYAN MUNN; TYLER VAUGHAN; BIG DREAMZ, LLC; AND MIRO GROUP, LLC,

       Defendants and
       Third-Party
       Plaintiffs,

v.

CASEY CARR; and STEPHEN PYE,

       Third-Party
       Defendants.

RYAN MUNN; and TYLER VAUGHAN, derivatively on behalf of KIXSPORTS, LLC,

       Derivative
       Plaintiffs,

v.

CASEY CARR; and STEPHEN PYE,

       Derivative
       Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 16373

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.    Kixsports, LLC is a small business that used to make and sell soccer-related products. In this case, it alleges that two members—Tyler Vaughan and Ryan Munn—secretly created a goalkeeper glove called Renegade GK for the purpose of competing against Kixsports. When the secret project was revealed, it caused a rift in the company. Vaughan and Munn ceased working there and, soon after, began

selling the Renegade GK brand through a new company. Kixsports has brought an array of claims stemming from these allegations of corporate theft.

2. Vaughan and Munn deny the allegations. They have responded with allegations that Kixsports breached several contracts and wrongfully interfered with their new business. They have also alleged that two fellow members, Casey Carr and Stephen Pye, lied about Kixsports's value, took improper distributions, and virtually abandoned the company, leaving it to Vaughan and Munn to keep Kixsports alive. These allegations are the basis for a host of counterclaims against Kixsports in addition to third-party and derivative claims against Carr and Pye.

3. Both sides have moved for partial summary judgment. For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** the motions.

> *Nelson Mullins Riley & Scarborough LLP, by Fred M. Wood, Jr., Evan M. Sauda, and Ariel E. Roberson, for Plaintiff and Counterclaim Defendant Kixsports, LLC, and for Third-Party/Derivative Defendants Casey Carr and Stephen Pye.*[1]

> *Parker Poe Adams & Bernstein, LLP, by A. Todd Sprinkle and Eric A. Frick, for Defendants and Counterclaim/Third-Party/Derivative Plaintiffs Ryan Munn and Tyler Vaughan, and for Defendants and Counterclaim/Third-Party Plaintiffs Big Dreamz, LLC and Miro Group, LLC.*

Conrad, Judge.

---

[1] After the motions were fully briefed and argued, counsel for Kixsports, Carr, and Pye moved to withdraw from the case, which the Court granted. (ECF No. 197.)

# I.
# BACKGROUND

4. The Court does not make findings of fact when ruling on motions for summary judgment. The following background, drawn from the evidence submitted by the parties, is intended only to provide context for the Court's analysis and ruling.

5. Kixsports is a North Carolina LLC, now dissolved, that sold soccer-related products: soccer balls, goalkeeper gloves, backpacks, etc. (*See* Aff. Pye ¶¶ 2–4, ECF No. 165.) The majority of its sales were made online, often through Amazon.com. (*See* Aff. Pye ¶ 4.)

6. An operating agreement governs Kixsports's operations and the rights and obligations of its members and managers. (*See* Aff. Pye Ex. A, ECF No. 165.1 ["Op. Agrmt."].) In general, the managers of Kixsports had the authority to direct its business without member approval, subject to a few exceptions not relevant here. (*See* Op. Agrmt. §§ 6.1, 6.4.) Section 6.6 states, in relevant part, that the managers were required to "devote only such time and effort to [Kixsports's] business and affairs as they deem reasonably necessary to discharge their duties as Managers," and that "[n]othing contained in this Agreement shall be construed to limit in any manner a Manager, solely by reason of being a Manager, from engaging or investing in any business venture or activity." (Op. Agrmt. § 6.6.) Section 3.4 purports to restrict members from competing against Kixsports. (*See* Op. Agrmt. § 3.4.)[2]

---

[2] Kixsports attempted to enforce section 3.4 through a motion for a temporary restraining order and a motion for a preliminary injunction, but the Court denied both. (*See* ECF Nos. 54, 14.) Kixsports later voluntarily dismissed its claim for breach of section 3.4. (*See* ECF No. 108.)

7. In early 2014, the founders of Kixsports, including Pye, sought new investors. (*See* Aff. Pye ¶¶ 5–7; Op. Agrmt. Recitals F, G.) Though it had no history of sales at that time, the company was valued at $2.5 million, supposedly based on the value of comparable retail companies. (*See* Aff. Pye ¶¶ 7, 8, 10; Dep. Pye 101:21–102:24;[3] Aff. Carr ¶ 5, ECF No. 164.) One of the new investors was Carr, who received an ownership interest in exchange for his assistance in further developing the company. (*See* Aff. Carr ¶¶ 2, 3, 6; Dep. Carr 11:19–12:3.) Carr also began receiving occasional monthly compensation. (*See* Aff. Carr ¶ 6.)

8. Not long after, Carr told Munn about Kixsports. The two were acquainted because their wives were friends. (*See* Dep. Munn 51:9–52:14; Aff. Carr ¶ 11.) Munn expressed interest, so Carr introduced him to Pye at a dinner in July 2014. (*See* Aff. Carr ¶¶ 7–10, 12.) The parties hotly contest the specifics of the dinner meeting. According to Munn, Carr and Pye made many false representations designed to induce him to invest in Kixsports. For example, Pye allegedly stated that he "could sell the rights to the KixFriction ball tomorrow for $1,000,000," implying that Kixsports had a valuable asset that would serve as security for investors. (5th Aff. Munn ¶¶ 10–12;[4] Dep. Munn 58:5–9, 128:5–129:19.) Carr and Pye deny making any

---

[3] For ease of reference, the excerpts of Pye's deposition testimony appear at ECF Nos. 165.4 and 167.1; the excerpts of Carr's testimony appear at ECF Nos. 164.1 and 168.1; the excerpts of Munn's testimony appear at ECF Nos. 165.3, 167.1, 190.8, and 192.1; and the excerpts of Vaughan's testimony appear at ECF Nos. 143.8, 167.1, and 191.1.

[4] As relevant to these motions, Munn has submitted six affidavits. (*See* Aff. Munn in Opp'n to Mot. for TRO, ECF No. 5 ["1st Aff. Munn"]; Aff. Munn in Opp'n to Mot. for PI, ECF No. 13 ["2d Aff. Munn"]; Aff. Munn in Opp'n to Mot. for Receivership, ECF No. 117.2 ["3d Aff. Munn"]; Aff. Munn in Supp. Defs.' Mot. for Partial Summ. J., ECF No. 160 ["4th Aff. Munn"];

such promises. (*See* Aff. Carr ¶¶ 13, 14; Aff. Pye ¶¶ 11–19.) In early August 2014, Munn invested $60,000 in Kixsports and became a member. (*See* 5th Aff. Munn ¶ 17; Aff. Carr ¶ 19; Aff. Pye ¶ 22.)

9. Vaughan, who had met Carr and Pye while coaching youth soccer, also became a member of Kixsports. (*See* Aff. Pye ¶¶ 30, 33; Dep. Vaughan 7:22–8:7; Aff. Vaughan ¶ 13, ECF No. 161.) It appears that Vaughan did not invest money to do so. (*See* Dep. Vaughan 33:19–24.) Rather, he invested his time and, at some point, began working for Kixsports as an employee. (*See* Aff. Pye ¶¶ 32, 33.)

10. Over time, Vaughan and Munn increased their roles with Kixsports. When Kixsports decided to raise capital in mid-2015, Munn invested a second time and became a manager. (*See* Aff. Pye ¶¶ 26, 34–36; Dep. Munn 109:14–110:16; 4th Aff. Munn ¶ 4.) Around the same time, he left his employer and joined Kixsports full time. (*See* Dep. Munn 109:25–110:16.) Munn testified that he agreed to develop Kixsports's business on Amazon.com in exchange for a commission—an oral agreement the parties have called the "Amazon business agreement." (*See* Dep. Munn 196:13–197:4.) For about two years, Munn managed Kixsports's day-to-day business and sales operations, communicating regularly with its suppliers, vendors, and current and potential customers. (*See* Aff. Pye ¶ 27; Dep. Munn 107:21–108:23.)

11. Vaughan worked part time at first, dealing primarily with building Kixsports's customer base. (*See* Dep. Vaughan 74:2–25.) Eventually, he became a full-time employee at Munn's request. (*See* Dep. Vaughan 34:4–7.) Vaughan signed

Aff. Munn in Opp'n to Pl.'s & 3d-Party Defs.' Mot. for Partial Summ. J., ECF No. 170 ["5th Aff. Munn"]; Aff. Munn in Supp. Defs.' Reply Br., ECF No. 190 ["6th Aff. Munn"].)

an employment agreement and significantly increased his involvement with Kixsports, working fifty to sixty hours a week. (*See* Dep. Vaughan 30:20–35:9, 67:22–68:5.)

12. By 2016, Vaughan and Munn had grown frustrated with a perceived lack of commitment and cooperation from Carr and Pye. It seems they felt that they were "carrying the company" and handling all the responsibility while Carr and Pye dedicated their time elsewhere. (Dep. Vaughan 69:23–71:7; *see also* Dep. Munn 194:2–10; 5th Aff. Munn ¶ 41.) Vaughan testified that he observed a stark contrast between the effort and work he contributed and the commitment and attentiveness of Carr and Pye. (*See, e.g.*, Dep. Vaughan 23:1–25:14, 34:21–35:9, 57:12–58:5, 149:6–24.) At some point, Vaughan and Munn became concerned that Carr and Pye were not just less committed, but that they were also engaging in misconduct such as misrepresenting Kixsports's value, filing inaccurate tax documents, and taking improper distributions. (*See, e.g.*, Dep. Munn 111:23–113:2, 194:2–10; 5th Aff. Munn ¶¶ 42–48.)

13. In November 2016, Vaughan and Munn began exploring the development of a goalkeeper glove line, potentially under a new brand. (*See* 1st Aff. Munn ¶¶ 18, 19.) Vaughan and Munn developed designs, launched marketing and advertising surveys, and communicated with suppliers. (*See, e.g.*, Aff. Pye Ex. G, ECF No. 165.7; 4th Aff. Munn ¶ 6.) Munn came up with a brand name—Renegade GK—as well as a logo and slogan. (*See* Dep. Munn 77:18–78:11, 97:8–13, 104:4–25.) Using his Kixsports e-mail

account, he contacted several suppliers about the new glove. (*See* Dep. Munn 105:25–107:6.)

14. The parties vehemently dispute how Vaughan and Munn developed the new glove and what they intended to do with it. Carr and Pye allege that Vaughan and Munn intended to use it to compete against Kixsports. (*See* Dep. Pye 127:23–25; Aff. Carr ¶¶ 25–34.) According to Carr and Pye, the project was kept secret, partly through a Slack messaging account used only by Vaughan and Munn. (*See* Dep. Munn 99:17–100:19; Aff. Carr ¶ 32.) Carr and Pye also claim that Vaughan and Munn used Kixsports's resources, concepts, brand, logo, and equipment. (*See* Aff. Carr ¶¶ 25, 28.)

15. Vaughan and Munn respond that they invested their own funds, came up with their own designs for some aspects of the glove, and used features common in the industry for others. (*See, e.g.*, Dep. Munn 86:16–87:10, 96:6–97:7; 2d Aff. Munn ¶¶ 22–24, Ex. A; 4th Aff. Munn ¶¶ 10, 18.) They also insist that the purpose of the project was to benefit Kixsports, possibly by putting the Renegade GK brand into a subsidiary or a separate company that would pay royalties to Kixsports. (*See* Dep. Munn 88:9–17, 96:13–97:7.) At any rate, Vaughan and Munn deny having any intent to compete against Kixsports, state that they always planned to disclose the project to Carr and Pye, and maintain that they had "the best interest of Kixsports at heart." (Dep. Munn 85:4–16; *see also, e.g.*, Dep. Vaughan 15:1–18:10; 1st Aff. Munn ¶¶ 1–21, 23, 27; 6th Aff. Munn Exs. D, E, F, ECF Nos. 190.5, .6, .7.)

16. Carr and Pye first learned about the glove project when Munn's wife mentioned it in passing to Carr's wife. (*See* Dep. Carr 25:1–26:2; Dep. Pye 128:1–10; 6th Aff. Munn Ex. D at 4, ECF No. 190.5.) And when Carr and Pye found out, sparks flew. (*See* Dep. Pye 127:23–132:5.) Pye notified Vaughan and Munn that they would not play day-to-day roles in the company moving forward and requested that they hand over any Kixsports-related passwords, e-mails, and operational material. (*See* Dep. Pye 127:1–17, 130:22–131:18; Aff. Pye ¶ 49.) In response, Munn denied access to Kixsports's Amazon sales account for two days. (*See* Dep. Carr 116:1–117:12.) Munn then left Kixsports in December 2016, though he retained his membership. (*See* Aff. Pye ¶¶ 48–50; Dep. Munn 76:14–19.) Vaughan was allowed to stay with the company on a limited basis, but he submitted his resignation in the spring of 2017. (*See* Aff. Pye ¶ 50; Dep. Vaughan 82:17–18; 6th Aff. Munn Ex. O, ECF No. 190.16.)

17. At that point, Munn says, he and Vaughan "put the Renegade GK idea on the shelf." (Dep. Munn 64:13–20.) But they circled back to the idea not long after Vaughan resigned from Kixsports. (*See* Dep. Munn 65:1–5.) Convinced that they were not restrained by the noncompete provision in Kixsports's operating agreement, Vaughan and Munn formed Miro Group, LLC, revived the Renegade GK brand, and began selling products. (*See* Dep. Munn 64:3–8, 74:6–14, 78:9–80:6.)

18. Kixsports filed this action in September 2017. Taking into account amendments of the pleadings and voluntary dismissals of certain claims, Kixsports continues to assert eleven claims. These include claims for breach of the duty of loyalty, usurpation of corporate opportunity, misappropriation of trade secrets, and

civil conspiracy (against Vaughan and Munn); conversion (against Munn); breach of contract (against Vaughan); and tortious interference with contract, trademark infringement, and unfair or deceptive trade practices (against all Defendants). (*See generally* Am. Compl., ECF No. 57; 2d Am. Compl., ECF No. 88.)[5]

19. Defendants filed five counterclaims: unjust enrichment, tortious interference, unfair or deceptive trade practices, and two claims for failure to pay amounts owed. They also asserted eight third-party claims stemming from their allegations that Carr and Pye looted Kixsports and put the company at risk through false tax reporting based on inaccurate valuations, among other things. Additionally, Defendants alleged that Carr and Pye fraudulently induced Munn to invest in Kixsports by misrepresenting or concealing aspects of its financial and business affairs. And they asserted three derivative claims against Carr and Pye on Kixsports's behalf for improper tax reporting, wrongful distributions, and breach of fiduciary duty. (*See generally* Countercl., ECF No. 36.)[6]

20. Discovery has closed. Both sides have moved for partial summary judgment. (ECF Nos. 157, 162.) The motions are ripe for determination.

---

[5] The second amended complaint added new claims without restating the entirety of the first amended complaint, so the Court must cite to both depending on the claim at issue. For clarity, the Court will refer to both in-text as the "second amended complaint."

[6] Some of the counterclaims, third-party claims, and derivative claims are not asserted by all Defendants, but only by a subset of them.

## II.
## LEGAL STANDARD

21.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all inferences in its favor.  *See Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 556 (2020); *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011).

22.     The moving party "has the burden of showing that there is no triable issue of material fact," which may be accomplished "by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim." *Vizant Techs.*, 373 N.C. at 555–56 (citations and quotation marks omitted).  "A fact is material if it would constitute or would irrevocably establish any material element of a claim or defense," and "a genuine issue is one which can be maintained by substantial evidence."  *Id.* at 555 (cleaned up).  Substantial evidence is "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference."  *Id.* (cleaned up).  If the moving party carries this burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial."  *Id.* at 556 (citation

and quotation marks omitted). In doing so, the nonmovant "may not rest upon the mere allegations or denials of his pleading." N.C. R. Civ. P. 56(e).

23. "When the party with the burden of proof moves for summary judgment, a greater burden must be met." *Almond Grading Co. v. Shaver*, 74 N.C. App. 576, 578 (1985) (citation omitted). There, the movant "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); *see also Kidd v. Early*, 289 N.C. 343, 370 (1976). For that reason, "rarely is it proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

III.
ANALYSIS

24. Altogether, the motions seek resolution of twenty-four claims for relief. Three require no analysis: at the hearing, counsel for Kixsports abandoned claim 4 (tortious interference against Vaughan and Munn), claim 5 (tortious interference against Big Dreamz and Miro Group), and claim 11 (trademark infringement against all Defendants) of the second amended complaint. (*See* Am. Compl. ¶¶ 66–79, 108–12.) The Court therefore grants Defendants' motion for summary judgment as to these claims.

25. For what remains, the Court first considers Kixsports's claims before turning to Defendants' counterclaims, third-party claims, and derivative claims. The legal theories underlying these claims are often similar. To avoid confusion, the

Court identifies the claims as numbered in the relevant pleading and, when possible, groups related claims.

### A. Kixsports's Claims for Breach of Fiduciary Duty

26. The Court begins with claims 2 and 3 of the second amended complaint. As to each, Kixsports alleges that Vaughan and Munn used its resources to create a goalie glove for their new competing business, thereby breaching their duty of loyalty (claim 2) and usurping a corporate opportunity (claim 3). Each side has moved for summary judgment.

27. Much like the director of a corporation, the manager of an LLC ordinarily has a fiduciary duty to act in good faith and in the company's best interests. *See* N.C.G.S. § 57D-3-21(b); *see also Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473 (2009). The manager's duty of loyalty includes an "obligation not to divert a corporate business opportunity for his own personal gain." *Meiselman v. Meiselman*, 309 N.C. 279, 307 (1983) (citation and quotation marks omitted). By contrast, "members of an LLC 'are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company.'" *Strategic Mgmt. Decisions, LLC v. Sales Performance Int'l, LLC*, 2017 NCBC LEXIS 69, at *10 (N.C. Super. Ct. Aug. 7, 2017) (quoting *Kaplan*, 196 N.C. App. at 473).

28. Because members have great freedom "to arrange their relationship however they wish," they can change these default rules in the LLC's operating agreement. *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17–18 (N.C. Super. Ct. June 19, 2019) (citations omitted). A "manager's duty of loyalty to

act in the best interest of the LLC is specifically 'subject to the operating agreement.' " *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *36 (N.C. Super. Ct. Oct. 21, 2016) (quoting N.C.G.S. § 57D-3-21(b)); *see also* N.C.G.S. § 57D-2-30(a).

29.     In seeking summary judgment, Vaughan and Munn argue that they did not owe fiduciary duties as members of Kixsports and that the operating agreement eliminated any fiduciary duties that Munn owed as a manager. (*See* Defs.' Br. in Supp. 5–6, 9–11, ECF No. 158.) They also argue that the economic loss rule bars the claims because this is really "a contract dispute over whether members, and a manager, of Kixsports violated the Operating Agreement." (Defs.' Br. in Supp. 13.)

30.     Kixsports responds that these arguments rest on a misreading of the operating agreement and a misplaced application of the economic loss rule. (*See* Pl.'s & 3d-Party Defs.' Opp'n 15–16, 21–22, ECF No. 166 ["Pl.'s Opp'n"].) Kixsports contends that it is entitled to summary judgment in its favor because the undisputed evidence shows that Munn breached his fiduciary duties as manager by secretly using company resources and relationships to develop and market a rival product. (*See* Pl.'s & 3d-Party Defs.' Br. in Supp. 15–17, ECF No. 163 ["Pl.'s Br. in Supp."].)

31.     It is undisputed that Vaughan was a member, not a manager, of Kixsports. (*See, e.g.*, Pl.'s Br. in Supp. 15.) In that role, he owed no fiduciary duties to the company. Kixsports doesn't argue otherwise. Rather, its theory is that Vaughan "acted in concert" with Munn to breach the duties that Munn owed as manager. (Pl.'s Br. in Supp. 17.) If true, Vaughan might be liable as a conspirator. But no evidence tends to show that he owed or breached duties of his own. Vaughan is therefore

entitled to summary judgment as to the claims for breach of the duty of loyalty and usurpation of a corporate opportunity.

32. As a manager, Munn owed a duty of loyalty to Kixsports unless the members agreed otherwise in the operating agreement. Munn points to section 6.6, which states, in relevant part, that "[n]othing contained in this Agreement shall be construed to limit in any manner a Manager, solely by reason of being a Manager, from engaging or investing in any business venture or activity." (Op. Agrmt. § 6.6.) Although Munn concedes that this language did not erase "all obligations to act in the best interests of the company," (Defs.' Reply Br. 8, ECF No. 189), he contends that it gave him the freedom to compete against Kixsports, (*see* Defs.' Br. in Supp. 10–11). On that basis, he contends that the development of Renegade GK cannot be a breach of the duty of loyalty.

33. Even if Munn's interpretation of section 6.6 as a license to compete is correct, his conclusion is not. The claims against Munn are not simply that he pursued other business ventures or competed against Kixsports. Rather, Kixsports offers evidence that Munn secretly developed the Renegade GK glove on company time and using its resources and business relationships. (*See, e.g.*, Pl.'s Opp'n 15–16.) This, if true, is akin to looting and is not absolved by the plain language of section 6.6.

34. Munn's reliance on the economic loss rule is equally unpersuasive. This doctrine "generally bars recovery in tort for damages arising out of a breach of contract." *Rountree v. Chowan County*, 252 N.C. App. 155, 159 (2017); *see also Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 376 N.C. 54, 58–62 (2020).

"To state a viable claim in tort for conduct that is also alleged to be a breach of contract, a plaintiff must allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *48 (N.C. Super. Ct. Nov. 3, 2011) (citation and quotation marks omitted).

35. As this Court recently observed, "a contracting party may have fiduciary duties to his counterparty that are separate and distinct from his contractual duties and thus may be enforceable in tort." *Perry v. Frigi-Temp Frigeration, Inc.*, 2020 NCBC LEXIS 100, at *17 (N.C. Super. Ct. Sept. 3, 2020); *see also Crescent Univ. City Venture*, 376 N.C. at 59 (noting that exceptions to the economic loss rule include "the breach of an extra-contractual duty" (citation omitted)). Such is the case here. The claims against Munn arise from the statutory duties that he owed as manager. Those duties were not eliminated by section 6.6, as Munn contends, and they are separate and distinct from any duties he may or may not have owed as a member under the operating agreement. These are garden-variety claims for breach of fiduciary duty, not attempts "to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim." *Strum v. Exxon Co., USA*, 15 F.3d 327, 329 (4th Cir. 1994). Accordingly, the economic loss rule does not bar the claims, and Munn has not shown that he is entitled to summary judgment.

36. Neither is this the rare case in which Kixsports, the party with the burden of proof, is entitled to summary judgment. There is evidence that Munn used his own resources to develop Renegade GK, planned to pitch the new goalie glove to Carr and

Pye, and intended to use the new product to benefit Kixsports. (*See, e.g.*, Dep. Vaughan 15:1–18:10; Dep. Munn 85:1–25, 90:3–20, 96:13–25; 1st Aff. Munn ¶¶ 1–21, 23, 27; 2d Aff. Munn ¶¶ 22–24, Ex. A; 3d Aff. Munn ¶¶ 6–8; 4th Aff. Munn ¶¶ 31, 32; 6th Aff. Munn Exs. D, E, F, ECF Nos. 190.5–.7.)[7] A jury must decide whether to credit this evidence and whether Munn acted in good faith and in the best interests of the company. The Court therefore denies Kixsports's motion for summary judgment as to its claims for breach of fiduciary duty and usurpation of a corporate opportunity. *See, e.g.*, *Ford v. Jurgens*, 2021 NCBC LEXIS 10, at *3–6 (N.C. Super. Ct. Feb. 2, 2021) (denying motion for offensive summary judgment); *Bizrobe Tr. v. InoLife Techs., Inc.*, 2018 NCBC LEXIS 160, at *16–17 (N.C. Super. Ct. Nov. 30, 2018) (same).

### B. Kixsports's Claim for Misappropriation of Trade Secrets

37. In claim 6 of the second amended complaint, Kixsports alleges that Vaughan and Munn misappropriated various trade secrets, including "customer and supplier information" consisting of "confidential purchase history, pricing information, design preferences, and negotiation history." (Am. Compl. ¶ 81.) During discovery, Kixsports revised the alleged trade secrets to include its "research and historical cost and sales data," "customer, vendor, and supplier contact information," and "financial

---

[7] Kixsports contends that Munn's fifth affidavit is a sham affidavit that contradicts his earlier sworn testimony on these matters. (*See* Pl.'s Opp'n 4–6.) The Court disagrees. At best, the alleged inconsistencies go to Munn's credibility. Kixsports has not pointed to any direct contradictions to render the affidavit a sham. In any event, even without the fifth affidavit, the remaining evidence creates a genuine issue of material fact as to these claims.

position and strategy." (ECF No. 159.3 at 6.) Vaughan and Munn move for summary judgment.

38. A trade secret is "business or technical information" that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C.G.S. § 66-152(3). A plaintiff must identify its trade secrets "with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609 (2018) (citation and quotation marks omitted). "[O]nce a plaintiff has demonstrated that it has a trade secret, it must also present 'substantial evidence' of misappropriation . . . ." *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *28 (N.C. Super. Ct. Apr. 23, 2015) (quoting N.C.G.S. § 66-155); *see also DSM Dyneema, LLC v. Thagard*, 2019 NCBC LEXIS 44, at *22 (N.C. Super. Ct. June 19, 2019).

39. Vaughan and Munn argue that the trade secrets, either as originally alleged or later revised, are not stated with adequate particularity and are unsupported by evidence. They also contend that the alleged trade secrets consist primarily of publicly known information. Finally, they deny misappropriating the trade secrets if any exist. (*See* Defs.' Br. in Supp. 16–21; 4th Aff. Munn ¶¶ 9–30.)

40. It was Kixsports's "responsibility to rebut these arguments by identifying the evidence that supports [its] claim and articulating how that evidence creates a genuine issue of material fact for trial." *Brewster v. Powell Bail Bonding, Inc.*, 2020 NCBC LEXIS 27, at *9 (N.C. Super. Ct. Mar. 11, 2020). Kixsports's opposition brief is silent, however, and lacks any evidence of protectable trade secrets or acts of misappropriation.

41. For the first time at the hearing, counsel for Kixsports argued that the company holds trade secrets in goalie glove branding and design. This theory, which appears nowhere in the second amended complaint, comes far too late. "Courts have made clear that a plaintiff may not simply wait until summary judgment to identify the trade secrets that it contends a defendant has misappropriated." *DSM Dyneema*, 2019 NCBC LEXIS 44, at *81–82 (citations omitted).

42. Because Kixsports has not presented evidence of its trade secrets or acts of misappropriation, summary judgment is appropriate. *See, e.g.*, *Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. 510, 519 (2009) ("Summary judgment should be granted upon the nonmovant's failure to identify that information which it claims to be a trade secret that was misappropriated."); *see also Bennett v. Bennett*, 2020 NCBC LEXIS 147, at *15 (N.C. Super. Ct. Dec. 16, 2020) (granting summary judgment when plaintiff presented no argument or evidence in support of claim); *Brown v. Secor*, 2020 NCBC LEXIS 134, at *24–25 (N.C. Super. Ct. Nov. 13, 2020) (same).

C. <u>Kixsports's Section 75-1.1 Claims</u>

43.     Kixsports asserts a claim for unfair or deceptive trade practices under N.C.G.S. § 75-1.1 against Vaughan and Munn (claim 7 of the second amended complaint).  This claim is predicated solely on the underlying claims against them for misappropriation of trade secrets and breach of fiduciary duty.  (*See* Am. Compl. ¶ 89.)  There is a parallel section 75-1.1 claim against Big Dreamz and Miro Group (claim 8 of the second amended complaint).  This claim also appears to be predicated only on the same alleged misconduct by Vaughan and Munn.  (*See* Am. Compl. ¶ 95.)

44.     Each side's arguments for and against summary judgment are largely bound up with their arguments concerning the merits of the underlying claims.  (*See* Defs.' Br. in Supp. 11, 22; Pl.'s Br. in Supp. 20–21.)  For the reasons discussed above, the section 75-1.1 claims must be dismissed to the extent they are based on alleged misappropriation of trade secrets.  In addition, Vaughan is entitled to summary judgment on the section 75-1.1 claim in its entirety because all underlying tort claims against him have been dismissed.  As to Munn, however, the underlying claim for breach of fiduciary duty remains.  The Court therefore denies the cross-motions to the extent the section 75-1.1 claim against Munn is based on the allegations that he breached his fiduciary duties.  *See Salon Blu, Inc. v. Salon Lofts Grp., LLC*, 2018 NCBC LEXIS 72, at \*19 (N.C. Super. Ct. July 16, 2018) (dismissing unfair or deceptive trade practices claim when the underlying claims had been dismissed and plaintiff had alleged no other unfair or deceptive acts); *Combs & Assocs., Inc. v.*

*Kennedy*, 147 N.C. App. 362, 373–74 (2001) (affirming summary judgment on same basis).

45. Although the role of Big Dreamz and Miro Group in the alleged wrongdoing isn't clear, neither side directly addresses the section 75-1.1 claim against them in more than cursory fashion. The claim appears to be based on the same conduct at issue for purposes of the claims for breach of fiduciary duty against Munn. Thus, the Court denies the cross-motions as to the section 75-1.1 claim against Big Dreamz and Miro Group to the extent it is based on those allegations.

### D. Kixsports's Conspiracy Claim

46. Claim 9 of the second amended complaint is for civil conspiracy against Vaughan and Munn. (*See* Am. Compl. ¶ 101.) "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002) (citation omitted).

47. As alleged, the conspiracy is premised on the claims for misappropriation of trade secrets, tortious interference with contract, and breach of fiduciary duty. (*See* Am. Compl. ¶ 101.) Only the claims for breach of fiduciary duty against Munn remain pending. On those claims, there is conflicting evidence about whether Munn breached his duties and whether Vaughan conspired with him. Thus, the Court denies the cross-motions as to the conspiracy claim to the extent based on the alleged conspiracy to breach Munn's fiduciary duties. The Court grants Defendants' motion

and dismisses the conspiracy claim to the extent it is based on the alleged conspiracy to commit tortious interference, misappropriate trade secrets, and breach Vaughan's purported fiduciary duties.

### E. Kixsports's Conversion Claim

48. In claim 13 of the second amended complaint, Kixsports alleges that Munn converted its sales account with Amazon. (*See* 2d Am. Compl. ¶¶ 120, 121.) Munn moves for summary judgment.

49. Conversion is the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439 (1956) (citation and quotation marks omitted). "Where there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 310–11 (2004) (citation and quotation marks omitted).

50. Munn argues that he did not refuse to return the Amazon account after a demand from Kixsports. (*See* Defs.' Br. in Supp. 23.) But Kixsports has offered evidence that, after Pye demanded access, Munn refused and waited two days before returning the account. (*See* Dep. Pye 127:1–17, 130:22–131:18; Aff. Pye ¶ 49; Dep. Carr 116:1–117:12.) Assuming that Munn rightfully came into possession of the account in the first place, there is sufficient evidence of demand and refusal to create a jury question. *See Wall v. Colvard, Inc.*, 268 N.C. 43, 49 (1966) ("After an act of

conversion has become complete, an offer to return or restore the property by the wrongdoer will not bar the cause of action for conversion." (citations omitted)); *Wining Taylors, LLC v. CE Precision, Inc.*, 2019 NCBC LEXIS 26, at \*9–10 (N.C. Super. Ct. Apr. 5, 2019) (noting that an offer to return property after demand and refusal does not bar a conversion claim).

51.     Next, Munn contends that Kixsports has no evidence of damages. (*See* Defs.' Br. in Supp. 23.)  Even if this were correct, it would not support summary judgment. Actual damages "are not an essential element of a conversion claim." *Heaton-Sides v. Snipes*, 233 N.C. App. 1, 6 (2014) (citation omitted).  If a jury concludes that Munn's denial of access constitutes conversion, then Kixsports "would be permitted to recover at least nominal damages." *Spinks v. Taylor*, 303 N.C. 256, 264–65 (1981) (reversing grant of summary judgment).

52.     For the first time in his reply brief, Munn argues that the economic loss rule bars the conversion claim. (*See* Defs.' Reply Br. 11.)  This single-sentence argument is both tardy and insufficient. *See Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 707–08 (2009) (rejecting argument raised for the first time in reply); *Brown*, 2020 NCBC LEXIS 134, at \*25 (same); *Potts v. KEL, LLC*, 2019 NCBC LEXIS 30, at \*30 n.4 (N.C. Super. Ct. May 9, 2019) (same); *Bennett*, 2020 NCBC LEXIS 147, at \*22 (rejecting single-sentence argument as "cursory" and not enough to raise a genuine argument on summary judgment).

53.     Accordingly, the Court denies Defendants' motion for summary judgment as to claim 13 of the second amended complaint.

### F. Defendants' Tortious Interference Claims

54. Turning to Defendants' claims for relief, Miro Group has asserted a counterclaim for tortious interference with prospective economic advantage against Kixsports (claim 3 of the counterclaims), and Vaughan, Munn, and Miro Group have asserted a similar third-party claim against Carr and Pye (claim 5 of the third-party claims). Both claims rest on allegations that Carr and Pye prevented Miro Group from launching its Renegade GK products on Amazon. (*See* Countercl. ¶¶ 155–62, 195–200.) Kixsports, Carr, and Pye move for summary judgment.

55. Tortious interference with prospective economic advantage "arises when a person induces a third party not to enter a contract with the plaintiff when the contract would have resulted but for the interference." *Lunsford v. ViaOne Servs., LLC*, 2020 NCBC LEXIS 111, at *13 (N.C. Super. Ct. Sept. 28, 2020) (citation and quotation marks omitted). Inducement means "purposeful conduct intended to influence a third party not to enter into a contract with the claimant." *KRG New Hill Place, LLC v. Spring Invs., LLC*, 2015 NCBC LEXIS 20, at *14 (N.C. Super. Ct. Feb. 27, 2015); *see also Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354 (2011).

56. Citing Munn's deposition testimony, Kixsports, Carr, and Pye argue that there is no evidence that they "attempted to interfere or did, in fact, interfere" with existing or prospective contracts with Amazon or any other third party. (Pl.'s Br. in Supp. 22.) In response, Defendants contend that Carr and Pye brought this lawsuit and moved for a preliminary injunction for the purpose of keeping Miro Group from

selling products on Amazon.  Defendants offer evidence that Miro Group delayed making a contract with Amazon while the motion for injunctive relief was pending. (*See* Defs.' Opp'n 8, ECF No. 169.)

57.   At best, this evidence shows that Kixsports, Carr, and Pye caused Miro Group not to pursue a contract with Amazon, not the other way around.  Defendants have not offered any evidence of purposeful conduct directed toward Amazon.  Nor have they offered evidence that Kixsports, Carr, or Pye influenced Amazon not to contract with Defendants.  Accordingly, the Court grants summary judgment in favor of Kixsports, Carr, and Pye as to Defendants' tortious interference claims.  *See KRG New Hill Place*, 2015 NCBC LEXIS 20, at *16–17.

### G. Defendants' Counterclaim for Quantum Meruit

58.   Next is Munn's counterclaim for quantum meruit against Kixsports (claim 4 of the counterclaims).  Munn alleges that he conferred benefits on Kixsports by "co-managing Kixsports for nearly one year and forgoing cash compensation in exchange for equity ownership" and by "establishing the e-commerce and online Amazon sales platform for Kixsports products." (Countercl. ¶¶ 164, 165.)  Kixsports has moved for summary judgment.

59.   A claim in quantum meruit "is neither in tort nor contract but is described as a claim in quasi contract or contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570 (1988).  "But when the parties have made an express contract, the law will not imply one 'with reference to the same matter.' " *Brown*, 2020 NCBC LEXIS 134,

at *12 (quoting *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713 (1962)); *see also Waters Edge Builders, LLC v. Longa*, 214 N.C. App. 350, 353 (2011).

60. Kixsports argues that there are two express contracts—the operating agreement and the Amazon business agreement—relating to the matters alleged. (*See* Pl.'s Br. in Supp. 22.) Defendants agree that quantum meruit relief is unavailable if the two contracts are enforceable. (*See* Defs.' Opp'n 9.) Although the parties dispute the meaning of the operating agreement and the terms of the Amazon business agreement, neither side has argued or offered evidence that the agreements are unenforceable. (*See, e.g.*, Countercl. ¶ 150; Pl.'s Br. in Supp. 22.) Therefore, the Court grants summary judgment in favor of Kixsports as to the counterclaim for quantum meruit. *See Catoe v. Helms Constr. & Concrete Co.*, 91 N.C. App. 492, 498 (1988) (holding that, while pleading in the alternative is permitted, "it is error to submit an alternative implied contract claim to the jury" when an express contract has already been established (citation omitted)).

## H. Defendants' Third-Party Claims for Fraud

61. Munn asserts identical claims for fraud and fraudulent inducement against Carr and Pye (claims 1 and 2 of the third-party claims). These claims are premised on false representations that Carr and Pye allegedly made to Munn to convince him to invest in Kixsports and forgo other business opportunities in favor of co-managing Kixsports without cash compensation. (*See* Countercl. ¶¶ 174–85.) For purposes of the pending motions, the Court treats the two claims as one.

62.     Fraud has five essential elements: "(a) a false representation or concealment of a material fact; (b) that was calculated to deceive; (c) that was made with intent to deceive; (d) that did in fact deceive; and (e) that resulted in damage to the injured party." *Bucci v. Burns*, 2020 NCBC LEXIS 79, at *13 (N.C. Super. Ct. June 30, 2020) (citation omitted).  The plaintiff must show not only that he "actually relied on the misrepresentation" but also that his "reliance was reasonable."  *Id.* at *18.  Reliance is not considered reasonable "where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."  *Cobb v. Pa. Life Ins. Co.*, 215 N.C. App. 268, 277 (2011) (citation omitted).

63.     Carr and Pye move for summary judgment.  They contend that they did not make a false representation and that, in any event, Munn cannot show reasonable reliance.

64.     **Scope of the Claim.**  At the outset, the parties dispute which alleged misrepresentations are still at issue.  Carr and Pye contend that Munn bases his claims "solely on a single statement"—a representation about the KixFriction ball that allegedly induced him to invest in Kixsports.  (Pl.'s Br. in Supp. 24.)

65.     In his opposing affidavit, Munn lists six more allegedly false representations: (1) that Kixsports was valued at $2,500,000, (2) that Kixsports was undervalued, (3) that professional soccer players had invested in Kixsports and would promote its products, (4) that other individuals had invested in Kixsports, (5) that Kixsports was growing, and (6) that current investors were being given exclusive additional investment opportunities that Kixsports would use to expand and partner

with another company.  (*See* 5th Aff. Munn ¶¶ 6–8, 11, 18, 19, 21, 22.)  These representations mirror the ones alleged in the pleadings.  (*See* Countercl. ¶¶ 10, 13, 14, 16, 22–24.)  Munn contends that each provides an independent basis for the fraud claims.  (*See* Defs.' Opp'n 13–15.)

66.    In their reply brief, Carr and Pye object to consideration of Munn's affidavit on the ground that it contradicts his and Carr's prior deposition testimony.  (*See* Pl.'s & 3d-Party Defs.' Reply Br. 3–8, ECF No. 192 ["Pl.'s Reply Br."].)  Any conflict with Carr's testimony is irrelevant, however.  Inconsistencies between two witnesses' testimony simply raise questions of fact and credibility for the jury to decide.  *See Marcus Brothers Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 226 (1999) (holding that a conflict between two witnesses' testimony "cannot be appropriately reconciled on a motion for summary judgment").

67.    Whether Munn's affidavit contradicts his own testimony is another matter. "A non-moving party cannot create an issue of fact to defeat summary judgment simply by filing an affidavit contradicting his prior sworn testimony."  *Carter v. W. Am. Ins. Co.*, 190 N.C. App. 532, 539 (2008) (cleaned up); *see also Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 79, at \*10 (N.C. Super. Ct. Aug. 2, 2018) (same).

68.    There is no contradiction here.  In his deposition, Munn was asked whether Carr made "any promises to you . . . about your investment in Kixsports at" a meeting in July 2014.  Munn testified that there were "probably not" any promises but that Carr had in fact spoken "a lot to the opportunities that were currently being

pursued . . . in terms of partnerships with other companies" and "about all the potential investors." (Dep. Munn 45:6–9, 53:24–54:16, 55:13–21, 55:25–56:23.) The statement that Carr made no *promises* does not necessarily mean that he made no *representations*. In fact, Munn's deposition testimony appears to say that Carr made representations about partnerships and other investors to induce his investment. Munn's affidavit is consistent with and supplements that testimony.

69.     Carr and Pye have not challenged these alleged misrepresentations on any other ground and therefore have not carried their initial burden to show an absence of a genuine issue of material fact. *See Vizant Techs.*, 373 N.C. at 555–56.

70.     **Representation Concerning the KixFriction Ball.** Carr and Pye directly address only one alleged misrepresentation: the supposed statement by Pye that he could "sell the rights to the KixFriction ball tomorrow for $1,000,000." (5th Aff. Munn ¶ 11; *see also* Dep. Munn 58:5–9, 128:5–129:19.) Carr and Pye contend that this statement, if made, was not false because Pye owns the ball's design patent. They further contend that Munn "unreasonably presumed" that Kixsports, not Pye, owned the patent rights. (Pl.'s Br. in Supp. 24; *see also* Aff. Pye ¶¶ 14–19.)[8]

71.     Context matters. Munn has testified that Pye made this statement while urging him to invest in Kixsports. In Munn's words, the KixFriction ball was a "safety blanket"—something Pye highlighted to give comfort about the security of an

---

[8] Carr and Pye quibble with the way Munn phrased the alleged representation in his affidavit ("sell the rights" to the ball) as opposed to his deposition testimony ("sell the ball"). (*See* Pl.'s Reply Br. 6–7; *compare* Dep. Munn 58:5–9, 128:5–129:19, *with* 5th Aff. Munn ¶ 11.) In the context of Munn's testimony, the distinction between the "ball" and the "rights" to the ball is splitting hairs.

investment in the company. (Dep. Munn 128:5–129:19; *see also* 5th Aff. Munn ¶¶ 10–14.) Viewed in a light most favorable to Munn, one possible inference from the evidence is that Pye falsely offered the KixFriction ball as a concrete example of Kixsports's value. Evaluating this evidence "is the jury's job, not the Court's." *Bucci*, 2020 NCBC LEXIS 79, at *15.

72. Next, Carr and Pye argue that Munn did not actually rely on the alleged misrepresentation. (*See* Pl.'s Br. in Supp. 25.) The evidence they cite—an excerpt of Munn's deposition—does not appear to be in the record. *See* Business Court Rule 7.5 (requiring that cited pages of supporting material be filed). In any event, Munn has testified that he invested as a direct result of relying on the alleged misrepresentation, which is sufficient to create a jury question. (*See* 5th Aff. Munn ¶¶ 9–14, 26, 29.)

73. Finally, Carr and Pye argue that Munn's reliance was not reasonable. Munn reviewed only a balance sheet, they contend, and therefore did not conduct sufficient diligence before investing. Additionally, they contend that Munn could have researched public information about the design patent covering the KixFriction ball, which would have revealed Pye as the patent's owner. (*See* Pl.'s Br. in Supp. 24–25.)

74. Neither argument is persuasive. Even assuming Munn considered a balance sheet and nothing more,[9] whether he "could have discovered the truth with

---

[9] The briefs include a testy exchange about what Munn did or did not consider before investing. Munn testified in his deposition that he had reviewed a balance sheet before deciding to invest in Kixsports. In an affidavit opposing Kixsports's summary judgment motion, Munn now claims that he also reviewed the operating agreement. (*Compare* Dep. Munn 50:15–24, 53:3–23, *with* 5th Aff. Munn ¶ 9.) Munn also points to an e-mail in which Carr sent him the operating agreement, (*see* ECF No. 177), but that e-mail was not produced

more diligence is unclear." *Bucci*, 2020 NCBC LEXIS 79, at *26. Several documents that Carr and Pye contend Munn should have reviewed, including investor materials, state that Kixsports owned design and utility patents for the KixFriction ball. (*See* Op. Agrmt.; ECF Nos. 139.21, .32, .36, .37.) This evidence suggests that, had Munn reviewed those documents, he would have seen representations about Kixsports's supposed intellectual property rights and would not have learned that Pye owned the design patent.

75.     It's also unclear whether Munn had an obligation to conduct any further investigation. Our courts have recognized that "[w]hether reliance is reasonable is dependent upon the circumstances." *Bucci v Burns*, 2018 NCBC LEXIS 93, at *5 (N.C. Super. Ct. Sept. 4, 2018) (citation and quotation marks omitted). When "the parties are not on equal footing, and a defendant possessing superior knowledge and/or experience makes a representation without giving the plaintiff reason to suspect the representation is false," it may be reasonable for the plaintiff to rely on that representation. *Slattery v. AppyCity, LLC*, 2021 NCBC LEXIS 24, at *19 (N.C. Super. Ct. Mar. 24, 2021) (citations omitted); *see also Walker v. Town of Stoneville*, 211 N.C. App. 24, 34–35 (2011); *Little v. Stogner*, 162 N.C. App. 25, 30 (2004). Carr and Pye have not explained why Munn should have had any reason to doubt the assurances they made to him.

---

during discovery, (*see* Pl.'s Reply Br. 6 n.2; Pl.'s Reply Br. Ex. D, ECF No. 192.1). Kixsports, Carr, and Pye ask the Court to exclude the evidence. The Court need not address that question now because whether Munn reviewed the operating agreement does not change the outcome of Carr and Pye's motion. Whether the evidence is admissible at trial is a question to address at the pretrial hearing.

76. There are also factual questions about whether Munn should have researched relevant patents, what he would have found had he done so, and whether that would have put him on notice to investigate further. Carr and Pye cite an excerpt from Munn's deposition in which he supposedly admitted that he was aware that patent applications are publicly available, yet again they did not attach the relevant excerpt or point to its location in the record. (*See* Pl.'s Br. in Supp. 24–25.) Nor did they attach a copy of the patent. Thus, this evidence is not properly before Court. *See* Business Court Rule 7.5.

77. Ultimately, "[t]he reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Forbis v. Neal*, 361 N.C. 519, 527 (2007) (citations omitted). That is not the case here. Accordingly, the Court denies Carr and Pye's motion for summary judgment as to the third-party claims for fraud and fraudulent inducement.

## I. Defendants' Third-Party Claim for Constructive Fraud

78. Munn has asserted a claim for constructive fraud against Carr and Pye (claim 3 of the third-party claims). (*See* Countercl. ¶¶ 186–90.) This claim is predicated on essentially the same grounds as the claims for actual fraud. Specifically, Munn alleges that Carr and Pye were "in a position of special trust and confidence to provide Ryan Munn with information and advice on investing in Kixsports" and that Carr and Pye "took advantage of this position of trust to benefit themselves" to Munn's detriment. (Countercl. ¶¶ 187, 189.)

79.     Constructive fraud is distinct from actual fraud.  It is premised on a breach of a "confidential relationship rather than a specific representation."  *Terry v. Terry*, 302 N.C. 77, 85 (1981).  "To establish constructive fraud, a plaintiff must show that defendant (1) owe[d] plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction."  *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620 (2012) (citation omitted).

80.     In seeking summary judgment, Carr and Pye deny that they had a fiduciary relationship with Munn at the time of his initial investment in Kixsports.  (*See* Pl.'s Br. in Supp. 26.)  They point to evidence that Munn did not know Pye before meeting to discuss Kixsports and that Munn and Carr were merely acquaintances at the time. (*See* Aff. Carr ¶ 11.)  Munn does not dispute this evidence.  He argues instead that Carr and Pye owed him a "special duty" because they fraudulently induced him to invest in Kixsports.  (Defs.' Opp'n 17.)

81.     Munn's argument is based on a misunderstanding of the phrase "special duty," which comes from precedents dealing with the distinction between individual and derivative suits.  Our courts have held that "a shareholder may maintain an individual action against a third party for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising from the same wrong, if the shareholder can show that the wrongdoer owed him a special duty." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658–59 (1997).  A fiduciary duty is an example of a special duty.  So is a contractual duty.  Other special duties— including "when the wrongful actions of a party induced an individual to become a

shareholder"—are neither fiduciary nor contractual, or at least not necessarily so. *Id.* at 659; *see also Howell v. Fisher*, 49 N.C. App. 488, 498 (1980).

82. Clearly, Munn has standing to sue in his own right for the fraud that Carr and Pye allegedly committed against him. Perhaps the allegations of inducement would also amount to a special duty as defined in *Barger* if that case applied here (which seems doubtful, given that Kixsports does not have "a cause of action arising from the same wrong," *Barger*, 346 N.C. at 659). Even so, a special duty of that kind is not necessarily fiduciary in nature, and the record does not reveal any other facts suggesting a fiduciary relationship. Rather, the undisputed evidence shows that Munn had an arms-length relationship with Carr and Pye. *See Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 60–61 (1992). Because Munn has not put forward any evidence of "special circumstances that could establish a fiduciary relationship," the Court grants Carr and Pye's motion for summary judgment as to the constructive fraud claim. *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599 (2018) (citation and quotation marks omitted).

### J. Defendants' Third-Party Claim for Civil Conspiracy

83. Defendants have also brought a claim for civil conspiracy (claim 6 of the third-party claims) against Carr and Pye. It is premised on an alleged agreement to "commit unlawful acts against Tyler Vaughan, Ryan Munn, and Miro Group," and includes all conduct giving rise to Defendants' other claims. (Countercl. ¶ 202.)

84. As already noted, civil conspiracy is not a standalone cause of action. *See Toomer*, 155 N.C. App. at 483. Therefore, the dismissal of Defendants' third-party

claims for tortious interference and unfair or deceptive trade practices means "those actions cannot support a claim for conspiracy either." *Potts*, 2019 NCBC LEXIS 30, at *22 (citation omitted).

85. But the third-party claims for fraud and fraudulent inducement remain. Carr and Pye argue that there is no evidence of an agreement between them. (*See* Pl.'s Br. in Supp. 27–28.) In support, they point to Munn's deposition, in which he testified that he was unable to identify evidence of an oral or written agreement between Carr and Pye. (*See* Dep. Munn 316:20–25.) Since Munn's deposition, though, Defendants have produced several messages between Carr and Pye that suggest a plan to recruit Munn to invest in Kixsports. (*See, e.g.*, ECF Nos. 139.6, .11, .38.)

86. An action for conspiracy may be proven through circumstantial evidence, and "[b]ehavior that may be benign or innocuous when standing alone can acquire a different meaning when placed in a larger context." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at *18 (N.C. Super. Ct. Sept. 29, 2011) (citations omitted). Given the totality of the evidence, a finder of fact could reasonably infer that Carr and Pye agreed to unlawfully induce Munn to invest in Kixsports. The Court concludes that the conspiracy claim may proceed to trial to the extent it is based on the underlying claims for fraud; in all other respect, it is dismissed.

## K. Defendants' Tax Reporting Claims

87. Vaughan and Munn allege that Carr and Pye caused Kixsports to report false information on state and federal tax returns based on an incorrect valuation of

the company. (*See, e.g.*, Countercl. ¶¶ 211, 212.) This allegation forms the basis of three claims against Carr and Pye: first, an individual claim for "improper conduct of company directors," (Countercl. ¶¶ 204–09) (claim 7 of the third-party claims); second, an individual claim for "improper tax reporting/valuation," (Countercl. ¶¶ 210–13) (claim 8 of the third-party claims); and third, a derivative claim on behalf of Kixsports for "improper tax reporting/valuation," (Countercl. ¶¶ 214–21) (claim 1 of the derivative claims).

88. As best the Court can tell, these are claims for breach of fiduciary duty. (*See* Countercl. ¶ 205 (referring to duties of Carr and Pye "[a]s company directors"); Defs.' Opp'n 23 (characterizing claims as for "breach of fiduciary duty").) For purposes of this motion, given the identical allegations, the Court treats these three claims as a single claim, asserted individually and derivatively, for breach of fiduciary duty.

89. In seeking summary judgment, Carr and Pye do not challenge the existence of a fiduciary duty or a breach of that duty. They argue, instead, that Vaughan and Munn have not shown evidence of actual damages. (*See* Pl.'s Br. in Supp. 28–29.) As our Supreme Court recently held, "potential liability for nominal damages is sufficient to establish the validity of claims for breach of fiduciary duty . . . and can support an award of punitive damages." *Chisum v. Campagna*, 2021-NCSC-7, ¶ 44. Therefore, the absence of evidence of actual damages does not defeat this claim.

90. That said, the Court has doubts about whether Vaughan and Munn have standing to pursue individual claims for what they now characterize as a breach of

the fiduciary duties that Carr and Pye allegedly owed to Kixsports.[10] The general rule is that members may not sue for their share of damages suffered by the company. *See Barger*, 346 N.C. at 659; *see also Bennett v. Bennett*, 2019 NCBC LEXIS 19, at \*13 (N.C. Super. Ct. Mar. 15, 2019) (observing that the *Barger* rule applies equally to LLCs and their members). Neither side has directly addressed whether Vaughan and Munn may sustain an individual claim on these facts. But these issues must be resolved because they implicate the Court's jurisdiction. *See* N.C. R. Civ. P. 12(h)(3); *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 611 (2018). Instead of resolving them without further input from the parties, the Court intends to address these matters at the pretrial hearing after additional briefing.

91. The Court therefore denies Carr and Pye's motion for summary judgment as to these three claims.

## L. Defendants' Derivative Claim for Wrongful Distributions

92. Vaughan and Munn assert a derivative claim on Kixsports's behalf for wrongful distributions (claim 2 of the derivative claims). As alleged, Carr and Pye took distributions beyond their proportional interest in the company. (*See* Countercl. ¶¶ 223, 224.) Carr and Pye have moved for summary judgment. They point to evidence that the disputed payments were not distributions but rather payments for work performed, and they also point to testimony from Munn acknowledging that

---

[10] Both sides gloss over the requirements for the existence of a fiduciary duty. The claim asserts that Carr and Pye acted improperly "[a]s company directors" and failed "to discharge their duties in good faith," resulting in harm to Vaughan and Munn. (Countercl. ¶¶ 205, 206, 209.) As already mentioned, LLC managers usually owe fiduciary duties only to the company, not to members or fellow managers. *See Kaplan*, 196 N.C. App. at 473–74.

capital contributions could be used to pay operational costs. (*See* Pl.'s Br. in Supp. 29; Aff. Carr ¶¶ 6, 18; Dep. Munn 25:1–18.) The opposition brief is silent in response. The Court therefore concludes that there is no genuine issue of material fact concerning alleged wrongful distributions and grants summary judgment in favor of Carr and Pye. *See, e.g., Bennett*, 2020 NCBC LEXIS 147, at *15 (granting summary judgment when plaintiff presented no argument or evidence in support of claim); *Brown*, 2020 NCBC LEXIS 134, at *24–25; *Brewster*, 2020 NCBC LEXIS 27, at *9 (same).

## M. Defendants' Derivative Claim for Breach of Fiduciary Duty

93. Vaughan and Munn assert a third derivative claim, which they label breach of fiduciary duty (claim 3 of the derivative claims). It is difficult to understand the basis for this claim, which is pleaded in highly general terms. (*See* Countercl. ¶ 232 ("Based on the conduct described herein, Casey Carr and Stephen Pye breached their duty of loyalty and fiduciary duties by advancing their own financial interest, to the detriment of Kixsports and its members.").) It is equally difficult to understand the briefs, which do not distinguish this claim from the other derivative claims. (*See* Pl.'s Br. in Supp. 29–30; Defs.' Opp'n 24–25.)

94. As best the Court can tell, after careful review, this claim duplicates the other derivative claims and has no independent basis. The Court therefore grants summary judgment in favor of Carr and Pye. *See In re Southeastern Eye Center-Pending Matters*, 2019 NCBC LEXIS 29, at *186–88 (N.C. Super. Ct. May 7, 2019)

(granting summary judgment when claim amounted to nothing more than a generic, catch-all claim).

## N. Defendants' Section 75-1.1 Claims

95. Liberally construed, Defendants' counterclaim against Kixsports and third-party claim against Carr and Pye for unfair or deceptive trade practices (claim 5 of the counterclaims and claim 4 of the third-party claims, respectively) appear to be premised on the same allegations that underlie their counterclaims for tortious interference and their third-party claims for fraud, improper tax reporting and valuation, and improper conduct of company directors. (*See* Countercl. ¶¶ 171, 192; Defs.' Opp'n 9–10, 19; Dep. Munn 314:10–315:19.) Defendants have pointed to no other basis for these section 75-1.1 claims aside from those underlying claims.

96. Given that the Court has granted Kixsports's motion for summary judgment as to the underlying counterclaims, summary judgment on the section 75-1.1 counterclaim is appropriate also. *See Salon Blu*, 2018 NCBC LEXIS 72, at *19–20 (granting summary judgment on section 75-1.1 claim when underlying claims had already been dismissed). But since several of the third-party claims have survived, dismissal of the section 75-1.1 third-party claim would be premature.

97. The Court therefore grants Carr and Pye's motion for summary judgment as to the section 75-1.1 counterclaim. The Court denies their motion as to the section 75-1.1 third-party claim. That claim may proceed to trial to the extent it is premised on the surviving third-party claims for fraud, conspiracy, and breach of fiduciary duty due to improper tax reporting.

CONCLUSION

98.     The Court therefore **ORDERS** as follows.

99.     Defendants' motion for partial summary judgment is **GRANTED in part** and **DENIED in part**:

a.      Defendants' motion for summary judgment as to Kixsports's claims for breach of the duty of loyalty and usurpation of a corporate opportunity is **GRANTED** as to Vaughan but **DENIED** as to Munn.  Claims 2 and 3 of the second amended complaint against Vaughan are dismissed with prejudice but will proceed to trial against Munn.

b.      Defendants' motion for summary judgment as to Kixsports's claims for tortious interference against Vaughan and Munn, for tortious interference against Big Dreamz and Miro Group, for misappropriation of trade secrets, and for trademark infringement is **GRANTED**.  Claims 4, 5, 6, and 11 of the second amended complaint are dismissed with prejudice.

c.      Defendants' motion for summary judgment as to Kixsports's claim for unfair or deceptive trade practices against Vaughan and Munn is **GRANTED** as to Vaughan.  The motion is **DENIED** as to Munn to the extent the claim is based on Kixsports's claims against him for breach of the duty of loyalty and usurpation of a corporate opportunity; in all other respects, the motion is **GRANTED**.  Claim 7 of the second amended complaint against Vaughan is dismissed with prejudice. The claim will proceed to trial against Munn with its scope limited as discussed.

d. Defendants' motion for summary judgment as to Kixsports's claim for unfair or deceptive trade practices against Big Dreamz and Miro Group, to the extent it is based on Kixsports's claims against Munn for breach of the duty of loyalty and usurpation of a corporate opportunity, is **DENIED**. In all other respects, the motion is **GRANTED**. Claim 8 of the second amended complaint is dismissed with prejudice to the extent it is not based on Kixsports's claims against Munn for breach of the duty of loyalty and usurpation of a corporate opportunity. The claim will proceed to trial with its scope limited as discussed.

e. Defendants' motion for summary judgment as to Kixsports's claim for civil conspiracy, to the extent it is based on an alleged conspiracy to breach Munn's fiduciary duties, is **DENIED**. In all other respects, the motion is **GRANTED**. Claim 9 of the second amended complaint is dismissed with prejudice to the extent it is not based on an alleged conspiracy to breach Munn's fiduciary duties. The claim will proceed to trial with its scope limited as discussed.

f. Defendants' motion for summary judgment as to Kixsports's claim for conversion is **DENIED**. Claim 13 of the second amended complaint will proceed to trial.

100. Kixsports, Carr, and Pye's motion for partial summary judgment is **GRANTED in part** and **DENIED in part**:

a. Kixsports's motion for summary judgment as to its claims for breach of the duty of loyalty, usurpation of a corporate opportunity, unfair or deceptive trade practices against Vaughan and Munn, unfair or deceptive trade practices

against Miro Group and Big Dreamz, and civil conspiracy (claims 2, 3, 7, 8, and 9 of the second amended complaint) is **DENIED**.

b.     Kixsports's motion for summary judgment as to Defendants' counterclaims for tortious interference, quantum meruit, and unfair or deceptive trade practices is **GRANTED**.   Claims 3, 4, and 5 of the counterclaims are dismissed with prejudice.

c.     Carr and Pye's motion for summary judgment as to Defendants' third-party claims for fraud and fraudulent inducement is **DENIED**.   Claims 1 and 2 of the third-party claims will proceed to trial.

d.     Carr and Pye's motion for summary judgment as to Defendants' third-party claim for constructive fraud is **GRANTED**.  Claim 3 of the third-party claims is dismissed with prejudice.

e.     Carr and Pye's motion for summary judgment as to Defendants' third-party claim for unfair or deceptive trade practices, to the extent it is based on Vaughan and Munn's surviving third-party claims for fraud, conspiracy, and breach of fiduciary duty, is **DENIED**.   In all other respects, the motion is **GRANTED**.  Claim 4 of the third-party claims is dismissed with prejudice to the extent it is not based on Vaughan and Munn's third-party claims for fraud, conspiracy, and breach of fiduciary duty.  The claim will proceed to trial with its scope limited as discussed.

f.     Carr and Pye's motion for summary judgment as to Defendants' third-party claim for tortious interference against them is **GRANTED**.  Claim 5 of the third-party claims is dismissed with prejudice.

g.     Carr and Pye's motion for summary judgment as to Defendants' third-party claim for civil conspiracy, to the extent it is based on Munn's third-party claims for fraud and fraudulent inducement, is **DENIED**.  In all other respects, the motion is **GRANTED**.  Claim 6 of the third-party claims is dismissed with prejudice to the extent it is not based on Munn's third-party claims for fraud and fraudulent inducement.  The claim will proceed to trial with its scope limited as discussed.

h.     Carr and Pye's motion for summary judgment as to Defendants' third-party claims for improper conduct of company directors and for improper tax reporting and valuation is **DENIED**.  Claims 7 and 8 of the third-party claims will proceed to trial.

i.     Carr and Pye's motion for summary judgment as to Defendants' derivative claim for improper tax reporting and valuation is **DENIED**.  Claim 1 of the derivative claims will proceed to trial.

j.     Carr and Pye's motion for summary judgment as to Defendants' derivative claims for improper distributions and breach of fiduciary duty is **GRANTED**.  Claims 2 and 3 of the derivative claims are dismissed with prejudice.

**SO ORDERED**, this the 1st day of April, 2021.

        /s/ Adam M. Conrad

Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases